**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALEXIS TAMBERG,** | : | /Criminal Case No. 19-138 (TSC) |
| | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
PRETRIAL DETENTION AND FOR EXCLUSION OF TIME**

The United States respectfully submits this Memorandum in support of its motion for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A) and § 4241(a-b) and for exclusion of time pursuant to 18 U.S. C. § 3161(h)(1)(A).

**FACTUAL BACKGROUND**

On April 17, 2019, the defendant posted on his Facebook page that he wanted to kill the President of the United States, Donald J. Trump.   After reviewing screenshots of the Facebook posts, United States Secret Service agents responded to the defendant's home to interview the defendant regarding the threats. The defendant admitted that he posted the messages and that he intended that they be taken seriously. He explained that he makes his posts when he becomes angry at the news he hears on television and online. The defendant also told the agents that he knew he had to post them online so they would be taken seriously, and that he meant what he said.   In response to questioning, the defendant stated among other things that he would be willing to see President Trump die.

During the interview, the defendant advised the Secret Service agents that he has struggled with issues. The defendant's mother subsequently provided additional information about the defendant's behavior. See Exhibit A.

Based on those posts, the defendant was arrested on April 19, 2019, on an arrest warrant and criminal complaint charging him with one violation of 18 U.S.C. Section 871 (threatening to kill or injure the President of the United States); and one violation of 18 U.S.C. Section 875(c) (threats in interstate communications).

On April 22, 2019, the defendant made his initial appearance before the Honorable Deborah A. Robinson. The government orally moved for a 24-hour competency screening examination pursuant to 18 U.S.C. § 4241 and that the defendant be held because the offense involves a crime of violence pursuant to 18 U.S.C. § 3142(f)(1)(A). Counsel for the defendant concurred with the request for a competency screening and requested that the preliminary hearing and detention hearing be held on April 26, 2019. The Court ordered a twenty-four hour competency screening and scheduled the hearing on April 26, 2019.

On April 24, 2019, the government returned an Indictment charging the defendant with one count of violating 18 U.S.C. § 871 (Threats Against the President) and one count of violating 18 U.S.C. § 875(c) (Transmitting Threats in Interstate Commerce).

## ARGUMENT

The Court should defer ruling on the government's request for detention until after a competency evaluation, a competency hearing, and any necessary period of competency treatment. "[I]f there is reasonable cause to believe that a defendant has a mental disease rendering him unable to understand the nature and consequences of the proceedings and against him and/or to assist in

his defense, it makes sense that the preliminary hearing and detention hearing be deferred until such time as the defendant has been determined to be mentally competent." *United States v. Moser*, 541 F. Supp. 2d 1235, 1237 (W.D. Okla. 2008). But see, "[T]he need for scrutinizing a defendant's understanding of the proceedings at initial phases appears to be somewhat lesser than during trial." *United States v. Crawford*, 738 F.Supp. 564, 565 (D.D.C. 1990).   Where there are concerns about a defendant's competency to understand the proceedings, it is also difficult to assess in any meaningful way the defendant's risk of flight.

If the Court is inclined to rule on detention at the hearing on April 26, however, the Court should find that no condition or combination of conditions would reasonably assure the defendant's appearance.

### FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE DETENTION

On or about April 17, 2019, at approximately 2:15PM, the Washington Field Office (WFO) Protective Intelligence Duty Desk Officer spoke to a Fairfax County, Virginia Sergeant regarding a concerned citizen who was contacted by an acquaintance on Facebook, identified as Alexis Tamberg, who made threats to kill the President of the United States (POTUS), Donald J. Trump who resides at 1600 Pennsylvania Avenue, N.W. Washington, D.C.

A USSS review of Alexis Tamberg's public Facebook page revealed several messages including: I WILL KILL DONALD J. TRUMP; MAKE AMERICA GREAT AGAIN KILL DONALD TRUMP YES WE CAN; Donald J. Trump I AM GOING TO KILL YOU FOR MY FLAG.   COME AND GET ME YOU COWARD; I WILL BREAK THEM SEEK VENGEANCE FOR MY BROTHER Donald J. Trump Alexandria Ocasio-Cortez your fates are one in the same; KILL FOR GAIN. SHOOT TO MAIM. WE DON'T NEED A REASON TO WAR AGAIN…;

Welcome Alexandria Ocasio-Cortez.   There's room in MAGA meat grinder for you too.   Barack Obama allows it.   STOP BEING SMART-GIRL-TRUMP. I FUCKING HATE YOU FOR COMPROMISING US.   CLIMATE CHANGE LEGISLATION IS A JOKE THANKS TO YOUR STUPID RGB COSTUME.   Alexandria Ocasio-Cortez lets go bitch, im not afraid of you.   I've already threatened the lives of Obama, Clinton and Trump.   THE FEDS AIN'T COMING. THEY HAVEN'T FOR YEARS. GET THE FUCK OFF OF INSTAGRAM YOU STUPID C***.

Further investigation revealed that Alexis Tamberg resides in Alexandria, VA.   At approximately 6:00PM, USSS Agents arrived at the residence with Fairfax County Officers to interview Tamberg. The interview was conducted outside the residence.   Immediately after identifying themselves as USSS Special Agents, Tamberg began ranting about the "deep state," Russian collusion, and wanting to see POTUS Trump be killed. Tamberg, who spent the duration of the interview shaking with clenched fists, described himself as a "State Department kid" who traveled back and forth between the US and foreign countries for his father's career. For that reason, he believes he himself is the Russian collusion.

When asked about the threats made online, Tamberg admitted that he posted them to his Facebook account from his tablet and computer. Both devices remain within his possession. Tamberg told agents that he hates POTUS Trump and wants to see him killed by either former President Obama (FPOTUS) or the "deep state." He advised that he hates POTUS Trump because he's racist and targets Obama's birth certificate. Tamberg admitted that he posts to Facebook when he becomes angry at the news he hears on TV and online.

Agents asked Tamberg if he knew that his threats would be taken seriously. Tamberg stated

that he intended for them to be taken seriously and knew he had to post them online so they would be taken seriously. He knew the consequences, knew authorities would see them because he believes he is being watched by Russians and Nazis, and meant what he said. In response to being asked if he wanted to harm POTUS Trump himself, he said the Russians want him to kill POTUS Trump but he did not want to do it himself. He further stated that he would be willing to die to see POTUS Trump die. Tamberg continued that 'if POTUS Trump is not killed, then he will either stand behind Kamala Harris, or become angry then probably commit suicide.'

At approximately 6:30PM as the conversation was concluding, Tamberg told agents that he planned on going back into his house to sleep and play his guitar. He said he understood the magnitude of the threatening statements he made online and extreme views he expressed during the interview. When agents returned back to WFO, open source revealed an extensively lengthy Facebook post that appeared to be written after authorities left his house. The post referenced the Cold War, FPOTUS Obama, POTUS Trump, multiple politicians, racism, and various other topics. The post was cryptically signed with a phrase, "see you in Valhalla," which is synonymous with heaven for those slain in battle.

I.      The Defendant Should Be Detained Pending Trial For the Safety of Others and the Community.

The Bail Reform Act lists four factors that guide a court's pre-trial detention decision: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  *See* 18 U.S.C. §3142(g).  At a detention hearing, the government may present evidence by way of a proffer.  *United States v. Smith*, 79 F.3d 1208,

1209-10 (D.C. Cir. 1996).   A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209.

### (1)  Nature and Circumstances of the Offense Charged

The nature and circumstances of the offenses charged support detention.   Threatening to kill the President of the United States is a serious offense. The postings were taken seriously not only by law enforcement but the citizen that was concerned and contacted the authorities. A consideration of the nature and circumstances of the offense also requires the Court to weigh the possible penalty the defendant faces upon conviction.   See *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).   Indeed, the seriousness of the defendant's crime is reflected in the sentence he would face if convicted.   The defendant faces at least 5 years of imprisonment for each offense which is significant.

### (2)  The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is substantial.   The defendant admitted to Secret Service agents that he made the threats and posted them from his personal computer and tablet.   The defendant's admission is corroborated by the screenshots which show that the threats were posted by a user named "Alex Tamberg" and by an account which is registered under the defendant's given name.

Moreover, the defendant expressly told Secret Service agents that he intended the posts to be perceived as threats and that he specifically posted them online so they would actually be taken seriously.   This is in contrast to his prior postings of threats on Facebook in 2014 that he stated were meant to intimidate others and make them stay away from him, and which thus represent an escalation of his dangerous intentions.

6

### (3)  The History and Characteristics of the Defendant

The defendant's history and characteristics also support pretrial detention, particularly insofar particularly insofar as they demonstrate that he represents a serious danger to others and the community.   The defendant lacks any significant social attachments; as he explained to Secret Service agents, he finds making friends difficult and others, including co-workers, often find him difficult and/or offensive.   Indeed, it was a Facebook acquaintance of the defendant's with whom he had not spoken in approximately ten years who notified law enforcement out of concern over the posts.   Likewise, former professors of the defendant were so concerned by nonsensical emails the defendant sent to them shortly before his arrest, that they notified the university even though he was no longer a student there.

The defendant has previously made threats to injure others.   The defendant attended the University of Mary Washington, and during the periods of his attendance, there were several incidents of concern regarding the defendant's mood, behavior, and statements.   The situation culminated with him being administratively withdrawn from enrollment for all of the 2014 summer session and banned from University housing for posting threats on his Facebook account about wanting to go to campus and "fire off some rounds."   He attributed the remarks to his mood problems and insecurities.   At the time, he stated that he did not actually mean the comments as a threat, but rather to "scare people and have them leave him alone."

The defendant was also arrested for assaulting his mother in 2014.   During an argument, the defendant erupted in anger and began throwing papers, folders, and other small items at his mother, some of which hit her.   He then proceeded to tear apart the kitchen, removing and throwing all the items from the cabinets and refrigerator.   The charge was subsequently dismissed.

A further proffer of his history will be provided to the court Undersea.   See Exhibit A.

**(4)  The Nature and Seriousness of the Danger to Any Person or the Community**

The nature and circumstance of the offenses charged in this case support detention.   The defendant has a history of acting out when his mood is off.   He also becomes angry when watching the news concerning politics.   As it is unlikely that such news reports will cease in the near future, it is likely that the defendant will again be triggered and prompted to post additional threats.   Thus, reliance on the defendant's mother is not sufficient to reasonably assure the safety of any other person and the community.

As noted above, unlike prior threats he has made, the defendant has expressly stated that he posted the threats at issue with the intent of actually making a threat.   While the defendant has also stated he did not himself want to hurt the President, he did state that the Russians wanted him to kill the President and that he would be willing to die to see the President die.

Under these facts, there is a very real danger that he could actually carry out his threats, otherwise harm the public, or hurt himself.   Such actions unequivocally underscore the government's position that the defendant is dangerous and should be detained pending trial.

II.    <u>The Court Should Exclude All Time From the Speedy Trial Clock for the Period From the Defendant's Indictment Through When a Decision Is Issued About His Competency To Stand Trial.</u>

The Speedy Trial Act, 18 U.S.C. § 3161, sets out the framework for the time in which a criminal defendant must be charged or brought to trial.   As a general matter, a defendant must be brought to trial within seventy days from the later of the date of filing of the information or indictment, or the date on which the defendant appeared before a judicial officer of the court in which the charge is pending.   18 U.S.C. § 3161(c)(1).   The Act provides for a number of

circumstances during which delay does not count against that seventy day clock, including any period of delay "resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant." § 3161(h)(1)(A).

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the United States of America respectfully requests that the detention hearing be deferred until competency is determined. The United States further requests that the defendant be detained pending trial in order to ensure the safety of others and the community, and that all time between his April 24, 2019 indictment and the date on which a determination regarding his competency to stand trial is made, be excluded from the calculation of the defendant's speedy trial clock.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By: _____/S/_____
BRENDA J. JOHNSON
Assistant United States Attorney
National Security Section
D.C. Bar No. 370737
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-7801

April 26, 2019